That Jackson-Randolph was never personally served with the affidavits of interest against the properties and that she did not receive actual notice of the interest before executing the quitclaim deeds is not dispositive. Jackson-Randolph is an attorney, and it is reasonable to impute to her the knowledge that a conviction and the imposition of a fine or restitution could lead to property forfeiture. Likewise, as an attorney she would know that a quitclaim deed to her herself and her husband as tenants by the entirety would make such forfeiture difficult. The district court did not err in making an enhancement for obstruction of justice.

Jackson-Randolph's enhancement for obstruction of justice will be affirmed.

## IX

For the foregoing reasons, the judgment of conviction and all aspects of the sentencing other than the imposition of the $10 million fine are AFFIRMED. The case is REMANDED to the district court for further findings concerning the imposition of the fine.

RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2002 FED App. 0066P (6th Cir.)
File Name: 02a0066p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————

UNITED STATES OF AMERICA,
      *Plaintiff-Appellee,*

      *v.*                                    No. 00-1073

MARIE ANTOINETTE
JACKSON-RANDOLPH,
      *Defendant-Appellant.*

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 96-80932—Lawrence P. Zatkoff, Chief District Judge.

Argued: October 24, 2001

Decided and Filed: February 22, 2002

Before: BOGGS and GILMAN, Circuit Judges; QUIST,
District Judge.

_____

[*]The Honorable Gordon J. Quist, United States District Judge for the Western District of Michigan, sitting by designation.

---

**COUNSEL**

---

**ARGUED:** Neil H. Fink, LAW OFFICES OF NEIL H. FINK, Birmingham, Michigan, for Appellant. Craig A. Weier, ASSISTANT UNITED STATES ATTORNEY, Detroit, Michigan, for Appellee. **ON BRIEF:** Neil H. Fink, LAW OFFICES OF NEIL H. FINK, Birmingham, Michigan, Carole M. Stanyar, Detroit, Michigan, for Appellant. Craig A. Weier, ASSISTANT UNITED STATES ATTORNEY, Detroit, Michigan, for Appellee.

---

**OPINION**

---

GORDON J. QUIST, District Judge. Marie Antoinette Jackson-Randolph appeals her conviction for conspiracy to commit program fraud and mail fraud, in violation of 18 U.S.C. § 371; program fraud, in violation of 42 U.S.C. § 1760(g); mail fraud, in violation of 18 U.S.C. § 1341; embezzlement/conversion of $5,000 or more from a program receiving federal funds, in violation of 18 U.S.C. § 666; and money laundering, in violation of 18 U.S.C. § 1956(a)(1)(B)(i). For the following reasons, we affirm Jackson-Randolph's conviction and the majority of her sentence, but remand to the district court for further findings on Jackson-Randolph's ability to pay a fine.

**I**

Defendant-appellant, Marie Antoinette Jackson-Randolph, was the founder and president of MAJCO, Inc., a nonprofit corporation that operated a private school and several day-care centers in Detroit, Michigan. MAJCO participated in the United States Department of Agriculture's Child Care Food Program ("CCFP"), administered by the Michigan Department of Education ("MDOE"), through which MAJCO received federal funds for serving meals to economically

factual circumstances," and appellate court precedent would only provide minimal help in making such determinations. *Buford*, 121 S. Ct. at 1281.

What deference is due? While the Court in *Buford* cites case law employing an abuse-of-discretion standard, the Court's comment was made in the context of justifying its move away from a de novo standard based on the competence of district courts. *Id.* at 1280 (citing *Koon v. United States*, 518 U.S. 81, 98-99, 116 S. Ct. 2035, 2046-47 (1996)). The decision from the Seventh Circuit which the Court affirmed, however, had concluded that clear error was the appropriate deferential standard. *United States v. Buford*, 201 F.3d 937, 942 (7th Cir. 2000). *See Malachinski v. C.I.R.*, 268 F.3d 497, 511-12 (7th Cir. 2001)(Posner, J., concurring)(citing the Supreme Court 's *Buford* decision for clear error standard when reviewing a district court's application of a sentencing guideline). It is well-settled that we overturn a court's factual findings in regard to the Sentencing Guidelines only if they are clearly erroneous. *United States v. Brawner*, 173 F.3d 966, 971 (6th Cir. 1999). We conclude that the clear error standard is also appropriate for reviewing sentencing decisions under § 3C1.1 where the sole issue before the district court is a fact-bound application of the guideline provisions.

**B**

Applying the above standard of review, we find that the district court did not commit clear error in finding obstruction of justice. The government's theory, which the district court accepted without further comment, reasonably infers that the execution of search warrants put Jackson-Randolph on notice of her impending indictment and that the administrative ruling on MAJCO's participation in the advance pay program further alerted her to that possibility. These two events, which took place only a few months before the execution of the quitclaim deeds, are enough to support an inference that Jackson-Randolph, a lawyer, knew she would be criminally investigated in connection with her fraud scheme at MAJCO.

and the "limited value of uniform court of appeals precedent" on a particular factual scenario. *Id.* at 1280-81. In *United States v. Hardin*, 248 F.3d 489 (6th Cir. 2001), the court concluded that this reasoning applies to § 2K2.1(b)(5), the sentencing guideline at issue in that case.[8] *Id.* at 493-94. *See also United States v. Paul*, -- F.3d -- , No. 00-41299, 2001 WL 1462963 (5th Cir. Nov. 19, 2001)(applying the *Buford* analysis and using deferential standard in reviewing district court's application of U.S.S.G. § 2G2.2).

The Court's reasoning and decision in *Buford* lead us to conclude that a deferential standard of review is appropriate in reviewing applications of § 3C1.1 as well. First, like determinations of whether gun possession was "in connection with" another felony offense or whether felony convictions are "related," the determination of whether a set of facts constitutes obstruction of justice is a fact-bound decision. As the Court noted in *Buford*, "factual nuance may closely guide the legal decision, with legal results depending heavily upon an understanding of the significance of case-specific details." *Buford*, 121 S. Ct. at 1280. Second, the district court has a "special competence" in making such sentencing determinations. *Hardin*, 248 F.3d at 494. District courts are required to make sentencing determinations on a regular basis and see and hear numerous variations on the same crime or theme to which they must apply the Guidelines. Third, as stated in *Buford*, there is limited value in uniform precedent in case-specific, fact-bound circumstances such as these. The question of whether conduct amounts to obstruction of justice "grows out of, and is bounded by, case-specific detailed

---

[8]Section 2K2.1(b)(5) of the Sentencing Guidelines provides for a four-level increase in unlawful gun possession convictions for possessing the gun "in connection with" another felony. The court did not actually decide whether the de novo or deferential standard should apply because the *Buford* decision had just been issued and the parties had not fully briefed or argued the issue. *Hardin*, 248 F.3d at 495. Based on the court's analysis and the statement that "we would be inclined to conclude that under *Buford*," such deference is required, a more recent case held that a deferential standard of review of a court's application of § 2K2.1 is appropriate. *United States v. Ennenga*, 263 F.3d 499, 502 (6th Cir. 2001).

disadvantaged children. Each month, MAJCO would receive reimbursement for the costs of meals served to eligible children. Reimbursement was based on either the number and type of meals served (i.e., breakfast, lunch, dinner, or snack) and the recipient's family size and income, or the costs actually expended in administering the food program, whichever was less. MAJCO received its CCFP payment in advance pursuant to a program designed to pay food costs before they were incurred. MAJCO submitted the same claim forms as used in the standard program but received payment for the projected claim amount beforehand based upon estimates from its average monthly payment. The actual claims were sent in at the end of the month, and any difference between the estimated and actual costs was made up the next month.

Program participants were not required to submit supporting documentation such as meal count sheets or food program receipts with their monthly claim forms, but the MDOE would audit participants once every two years. MAJCO was audited in June 1990 and May 1993. In an audit, MDOE officials reviewed the claim forms submitted and compared them with the daily meal count sheets recorded at the "point of service" each day for the meals served to each child. They would also observe on-site delivery service of the meal, record-keeping procedures, sanitation, and capacity. Notice of the time and place of the inspection was usually given to MAJCO.

Jackson-Randolph was intimately involved in MAJCO's daily operations. She controlled the checking accounts and made all final decisions on personnel, finances, and other business matters. As landlord, she owned the properties at which the centers operated and received rent payments from MAJCO. Jackson-Randolph visited the centers on a regular basis, often interacting with the children and giving instructions to the staff. She even taught an English class at the school. For the food program, Jackson-Randolph reviewed and signed each claim submitted to the MDOE. She was the contact person for the CCFP and received notification

of the times and places of the audits of MAJCO's centers. She personally oversaw MAJCO's preparation for the audits.

Between 1988 and 1993, MAJCO sought and received reimbursement for meals it never served by submitting false claims to the MDOE that inflated the number of meals served and the costs of the food program. These inflated claims submissions were reviewed in the audit and required documentary support. For example, program participants like MAJCO were required to keep a daily tally of meals served on a meal count sheet completed at the point of service. The list contained the names of children served and what meals they received. MAJCO workers testified that they were often given meal count sheets with numerous pages of names of children who did not attend and did not receive meals. Sometimes, blank meal count sheets containing monthly figures were distributed, and the employees were instructed to fill in the blank pages to match the total claimed at the bottom of the sheet. Before an impending audit, MAJCO would hold "cram" sessions, often working late into the night. Employees would create documents supporting MAJCO's food program claims, including meal count sheets, attendance records, family size and income forms, and program receipts and invoices. Employees took names out of the phone book and used lists of Jackson-Randolph's college students' names to put into the records. Employees completed family size and income forms and forged parent signatures. Finally, on the day of the administrative review, Jackson-Randolph would order the transfer of children from one center to the site of the audit to give the appearance of increased attendance as claimed by MAJCO on its submissions.

Jackson-Randolph's explanation for all this activity was that they were simply attempting to re-create MAJCO's poorly kept records on how many children received meals. She asserted that parents often forgot or refused to fill out the family size and income forms required by the program. Her defense to the government's accusation of fraud was that the record-keeping requirements were overwhelming, MAJCO's staff had extreme difficulties maintaining accurate records,

## A

18 U.S.C. § 3742(e) states that the court of appeals "shall accept the findings of fact of the district court unless they are clearly erroneous and shall give due deference to the district court's application of the guidelines to the facts." There are inconsistent opinions in this circuit regarding what deference is due when reviewing the application of U.S.S.G. § 3C1.1. *Compare United States v. Bennett*, 975 F.2d 305, 308 (6th Cir. 1992)(stating that district courts have "considerable discretion" in deciding whether a defendant's conduct amounts to obstruction of justice and that we review the decision for abuse of discretion); *United States v. Medina*, 992 F.2d 573, 591 (6th Cir. 1993)(same); *with United States v. Sanchez*, 928 F.2d 1450, 1458 (6th Cir. 1991)(concluding that the question of whether a defendant's conduct constitutes obstruction of justice centers on a legal interpretation of the guideline and calls for a de novo review); *United States v. McDonald*, 165 F.3d 1032, 1034-35 (6th Cir. 1999)(reviewing prior decisions and concluding that a determination of whether a set of facts constitutes obstruction of justice is a mixed question of law and fact that is reviewed de novo).

The Supreme Court's recent decision in *Buford v. United States*, 121 S. Ct. 1276 (2001), changes our prior analyses of the appropriate standard of review of the § 3C1.1 enhancement. In *Buford*, the Court unanimously held that a court of appeals should review a district court's application of U.S.S.G. § 4B1.2 "deferentially" rather than de novo. *Id.* at 1280.[7] The Court based its conclusion in part on 18 U.S.C. § 3742, which calls for "due deference" to a district court's application of the sentencing guidelines to the facts. *Id.* at 1279 (quoting 18 U.S.C. § 3742(e)). The Court then gave three reasons to support a deferential standard: the district courts' expertise and experience in applying sentencing provisions, the fact-specific nature of such determinations,

---

[7] Section 4B1.2 provides that, with respect to determining whether a defendant is a "career offender", a sentencing judge must count as a single conviction all those that are "related" to one another.

investigation into MAJCO's food program. In August 1993, an administrative law judge ordered that MAJCO be taken off the advanced pay program for violations of department regulations. In September, the United States filed affidavits of interest on MAJCO's properties, owned by Jackson-Randolph, which functioned as liens to protect a potential forfeiture claim by the government. Then in November, Jackson-Randolph executed the quitclaim deeds, thus divesting her sole personal ownership in the properties and making forfeiture more difficult in the event of a conviction. These events taken together with Jackson-Randolph's knowledge as an attorney suggest, according to the government, that Jackson-Randolph became aware of the investigation and took steps to obstruct the efforts of the government. The district court accepted the government's theory despite the recommendation in the PSR that no obstruction of justice enhancement be made.

Jackson-Randolph presents two primary objections to this enhancement. First, she notes that the affidavit of interest filed by the government in September did not give her notice of the lien obtained because the document is filed with the clerk of the municipality and is not served on the property owner. Thus, Jackson-Randolph argues that while she may have been on "record notice" of the claim, she did not have actual notice that might prompt her to obstruct the government's potential forfeiture. Second, Jackson-Randolph claims that the quitclaim deeds were merely part of an overall estate planning venture that began the previous year, and at sentencing she offered to provide testimony from her attorney supporting this assertion.

and the claims were often estimated by employees. Jackson-Randolph claimed that the transfer of children from one site to another during audits was meant to avoid sanctions for overcapacity.

At trial, the government estimated that MAJCO received between $13.5 and $15.5 million more than it was entitled during this period. This amount was calculated based upon witness testimony of how many children actually attended each center, the centers' roll books, and immunization records in the nurse's office. Jackson-Randolph claimed that the roll books, only half of which were recovered and used, were inaccurate because parents often failed to sign in their children and some roll books did not include drop-ins.

To embezzle and launder the excess money taken through the CCFP, Jackson-Randolph would have MAJCO pay false invoices of a vendor, Allen Cohen, who would deposit the checks and return the money to Jackson-Randolph in cash or checks payable to her personally. These invoices were also used to substantiate the food program costs submitted to the MDOE. Based upon bank records over the course of the indictment period, MAJCO issued checks to Berkley Foods, an operating name of Cohen, totaling $2,032,579. Checks totaling $1,264,073 were drawn on various Cohen accounts and deposited into Jackson-Randolph's personal accounts. In addition, Jackson-Randolph had MAJCO purchase cashier's checks payable to Berkley Foods and would later deposit them into her personal accounts with the notation "not for purposes intended." She would also submit copies of those same cashier's checks to her accountant and assert that she paid for the checks with her own funds, thus inflating her "officer loan" account. Jackson-Randolph claimed that she often personally loaned money to MAJCO and sometimes did not document the loans and that the deposits covered those loans. Finally, Jackson-Randolph had her father, brother, and housekeeper placed on the MAJCO payroll even though they were not employed by MAJCO. They received a total of $154,064, issued in biweekly checks. Jackson-Randolph

claimed that these payments offset the loans she made to MAJCO.

Jackson-Randolph was convicted on several counts of program and mail fraud, embezzlement, and money laundering. She was sentenced to 15 months in prison and ordered to pay $13.5 million in restitution and a $10 million fine. On appeal, she alleges that: (1) the district court abused its discretion in admitting evidence of her personal spending habits, (2) the district court erred in excluding evidence showing that MAJCO employees estimated CCFP costs, (3) the district court abused its discretion in excluding evidence regarding a government witness's failure to file an income tax return, (4) the prosecutor deprived the defendant of a fair trial by speaking to a government witness during a break in the trial, (5) the district court abused its discretion in admitting summary evidence regarding the amount of money that Jackson-Randolph allegedly overbilled the CCFP, (6) the district court erred in ordering $13.5 million in restitution and a $10 million fine, and (7) the district court clearly erred in making the factual findings that it relied upon in enhancing her sentence for obstruction of justice.

We review all of the district court's evidentiary rulings for abuse of discretion. *Trepel v. Roadway Express, Inc.*, 194 F.3d 708, 716-17 (6th Cir. 1999)(citing *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 141, 118 S. Ct. 512, 517 (1997)). We reject Jackson-Randolph's first five claims and her seventh claim, but remand the district court's decision to impose a $10 million fine for further findings on Jackson-Randolph's ability to pay such a fine in addition to the $13.5 million in restitution.

## II

The defense filed a motion in limine requesting that the court exclude evidence regarding Jackson-Randolph's lavish lifestyle on the basis of Rule 403 of the Federal Rules of Evidence. The defense also objected to the introduction of this evidence on several occasions at trial. The district court overruled the objections and permitted the government to

obligated to make." U.S.S.G. § 5E1.2(d)(4). We have noted a split among the circuits, but have not ruled, on whether a district court is required to make express factual findings on the record when determining the ability to pay a fine. *United States v. Tosca*, 18 F.3d 1352, 1354-55 (6th Cir. 1994)(implying that detailed findings are not necessary where it could be inferred that the district court considered the defendant's ability to pay and other factors). At the end of the day, "[t]he amount of the fine should always be sufficient to ensure that the fine, taken together with other sanctions imposed, is punitive." U.S.S.G. § 5E1.2(e).

There certainly is no disagreement here that a $10 million fine is punitive. The issue regarding the imposition of a fine is whether the district court considered the financial impact of the restitution. Maybe it did, maybe it did not. The record is barren in that respect. The $13.5 million in restitution represents what Jackson-Randolph fraudulently received, but we are not sure how the district court found that Jackson-Randolph could pay an additional fine of $10 million. We are not suggesting that the district court should impose no fine. Indeed, some fine might be appropriate, and we hold that a district court has considerable discretion in determining the amount of a fine. But the exercise of such discretion must consider the impact of the restitution ordered.

Therefore, we reverse and remand for further findings the district court's order that Jackson-Randolph pay a $10 million fine in addition to over $13.5 million in restitution. 18 U.S.C. § 3742(f)(1).

## VIII

At sentencing, the government argued for a two-point increase under § 3C1.1 of the Sentencing Guidelines for obstruction of justice. The government argued that Jackson-Randolph quitclaimed certain properties to herself and her husband as tenants by the entirety in order to thwart potential forfeiture of those properties to the government. Federal agents had executed 17 search warrants at MAJCO centers and its headquarters on May 11, 1993, beginning an in-depth

sentencing factors, including the ability to pay restitution. In addition, the PSR indicated that Jackson-Randolph was married to an attorney and had no children. *Id.*

With such a record before it, the district court, even if it could have, had no further obligation to launch another investigation to try to find out exactly where Jackson-Randolph is hiding assets. Rather, the district court could appropriately find that Jackson-Randolph did not carry her burden of proof that she could not pay restitution in the amount of the determined loss.

Thus, we conclude that the district court did not err in imposing restitution of $13,571,296.

B

When determining whether to impose a fine and its amount, the court is to consider (1) the defendant's income and earning capacity, (2) her financial resources, (3) the burden on the defendant and her dependents, (4) whether restitution is ordered and the amount of restitution, (5) the need to deprive the defendant of illegal gains, and (6) the need to promote respect for the law. 18 U.S.C. § 3572(a); U.S.S.G. § 5E1.2(d). If the defendant has the obligation to make restitution to a victim, the court shall impose a fine only to the extent that such a fine will not impair the ability of the defendant to make restitution. 18 U.S.C. § 3572(b).[6] At all relevant times, U.S.S.G. § 5E1.2(a) has stated, "[t]he court shall impose a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine." Once again, however, the district court is directed to consider several factors, including "any restitution or reparation that the defendant has made or is

_____

[6]Since 1996, § 3572(b) has read: "If, as a result of a conviction, the defendant has the obligation to make restitution to a victim of the offense, other than the United States, the court shall impose a fine or other monetary penalty only to the extent that such fine or penalty will not impair the ability of the defendant to make restitution."

introduce evidence of Jackson-Randolph's purchases of expensive jewelry, clothing, and several fur coats. The government also presented evidence of Jackson-Randolph's trips to Aruba, the Bahamas, Las Vegas, and Atlantic City for gambling, where Jackson-Randolph arranged large lines of credit prior to arrival. Witnesses also testified to Jackson-Randolph's propensity to give away expensive gifts such as jewelry, clothing, and trips. A government agent estimated her expenditures during the indictment period at $3,896,939. This evidence, Jackson-Randolph asserts, was merely inflammatory, prejudicial, and irrelevant to any issue in the case.

The government argued at trial, as it does on appeal, that the evidence of Jackson-Randolph's lifestyle was relevant to her motive for committing the alleged crimes. According to the government, Jackson-Randolph needed large amounts of money to maintain her lifestyle and spending habits. Jackson-Randolph counters by noting that she had several legitimate sources of income such as rent proceeds, a teaching salary, and investments, and that she was wealthy before she began MAJCO, with a net worth of over $2 million. The district court agreed with the government and cited three cases to support its ruling that lifestyle evidence is admissible to show motive: *United States v. Mitchell*, 31 F.3d 628, 631 (8th Cir. 1994)(holding that evidence of an accomplice's exorbitant lifestyle was relevant to the structure of a transaction to avoid currency reporting requirements and the accomplice's motive); *United States v. Bailie*, Nos. 96-30047, 96-30048, 96-30049, 1996 WL 580350, at *7 (9th Cir. Oct. 8, 1996)(holding in a federal education loan fraud case that evidence of extravagant lifestyle was relevant to motive); *United States v. Frost*, 914 F.2d 756, 768-69 (6th Cir. 1990)(agreeing with the district court that the prosecutor's references to the defendants' lifestyles were relevant to motive for committing bribery and misapplication of funds, especially in light of fact that the defendants opened the door to lifestyle evidence by referring to the lifestyle of a co-conspirator during opening statements).

Broad discretion is given to district courts in determinations of admissibility based on considerations of relevance and prejudice, and those decisions will not be lightly overruled. *United States v. Hawkins*, 969 F.2d 169, 174 (6th Cir. 1992); *United States v. Stull*, 743 F.2d 439, 445 (6th Cir. 1984). If we find an abuse of discretion, we reverse the district court's judgment only if the error was not harmless. *United States v. Carter*, 969 F.2d 197, 201 (6th Cir. 1992).

Although it found no prejudicial error, in *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 60 S. Ct. 811 (1940), the Supreme Court said that "appeals to class prejudice are highly improper and cannot be condoned and trial courts should ever be alert to prevent them." *Id.* at 239, 60 S. Ct. at 852. This court has already recognized that prosecutorial appeals to wealth and class biases can create prejudicial error, violating a defendant's right to due process of law under the Fifth Amendment. *Sizemore v. Fletcher*, 921 F.2d 667, 671 (6th Cir. 1990); *see also United States v. Stahl*, 616 F.2d 30, 31-33 (2d Cir. 1980). Furthermore, it is illogical and improper to equate financial success and affluence with greed and corruption. *Stahl*, 616 F.2d at 33. Much, probably most, wealth and affluence are gained through honest and socially desirable or socially neutral means such as hard work, innovation, successful investments, inheritance, good luck, etc.

Sometimes, however, evidence of extreme wealth or extravagant spending is admissible under Federal Rules of Evidence 401 and 403. For example, in a narcotics case, we have held that the government can link failure to file an income tax return to extravagant spending or massive unreported wealth. The relevance of this evidence is to create "the inference that the defendant does not possess a legitimate source of income to support his affluent lifestyle and, therefore, the income must originate from narcotics operations." *Carter*, 969 F.2d at 201. *See United States v. Marshall*, 248 F.3d 525, 532-33 (6th Cir. 2001)(sudden unexplained wealth shortly after $60,000 was stolen from an

The district court reviewed the file, the PSR, the objections and memoranda of the parties, and the letters written on Jackson-Randolph's behalf. Most importantly, the sentencing court presided over Jackson-Randolph's trial and thus had an extensive exposure to the facts of the case, including Jackson-Randolph's ability to utilize sophisticated means to cheat and to hide assets. Even though the prosecutor argued for a higher restitution amount, the court's restitution was consistent with the amount of loss calculated by Agent LaFleur.

The issue is whether Jackson-Randolph has the ability to pay the restitution. The burden of proving lack of financial resources to pay restitution is on the defendant. 18 U.S.C. § 3664(e). Even an indigent can be ordered to pay restitution. *United States v. Blanchard*, 9 F.3d 22, 25 (6th Cir. 1993). Jackson-Randolph argues that the PSR shows that she does not have the ability to pay the restitution and that the presentence writer concluded that she could not pay restitution. The problem with this argument is that the legitimate sources of income and statements of assets reviewed by the presentence writer came from Jackson-Randolph herself, and there is no reason for the district court to have accepted these statements at face value. The district court was fully aware of Jackson-Randolph's extensive and sophisticated scheme to defraud, to launder money, and to hide money in a foreign bank.

Arrayed against Jackson-Randolph's statements after her conviction is evidence that Jackson-Randolph stole over $13.5 million and the district court's knowledge that the money went somewhere; Jackson-Randolph obtained approximately $1 million from MAJCO each year; she received over $1.5 million in checks from Cohen; she kept an offshore bank account which she failed to disclose on her income tax returns; she purchased numerous expensive goods such as fur coats and jewelry (but her extraordinarily extravagant lifestyle does not explain where over $13 million went); and she is well educated with an ability to honestly earn substantial sums in the future. *See id.* It is the district court's duty, and not the presentence writer's, to determine the

We conclude that the district court did not abuse its discretion in admitting the summary testimony of LaFleur regarding the discrepancy between the number of children actually served and the amount claimed by MAJCO.

## VII

The judgment against Jackson-Randolph included a restitution award of $13,571,296 and a fine of $10 million. The presentence report ("PSR") recommended that this restitution be paid to the USDA, but it indicated that Jackson-Randolph had a negative net worth of $1,413,716 and that she was not expected to be able to pay a fine. The district court stated, however, its belief "that the funds are there somewhere." Jackson-Randolph now contests the imposition of the restitution and fine.

### A

The amount of a restitution award is reviewed for an abuse of discretion. *United States v. Adams*, 214 F.3d 724, 730 (6th Cir. 2000). The factors to be considered by a district court when imposing restitution are (1) the amount of loss sustained as a result of the offense, (2) the financial resources of the defendant, (3) the financial needs and earning ability of the defendant and the defendant's dependents, and (4) other appropriate factors. *Id.*; 18 U.S.C. § 3663.[5] The information relied upon by the court in making its determination must have a "'sufficient indicia of reliability to support its probable accuracy.'" *United States v. Herrera*, 928 F.2d 769, 773 (6th Cir. 1991)(citation omitted); *see also United States v. Smith*, 887 F.2d 104, 108 (6th Cir. 1989). Specific findings in the imposition of restitution are not required. *Frost*, 914 F.2d at 774.

---

[5] The offense of conviction occurred prior to the mandatory restitution provisions of 18 U.S.C. § 3663A were passed. The government does not argue that 18 U.S.C. § 3663A should be applied in this case.

ATM was admissible); *United States v. Layne*, 192 F.3d 556, 574 (6th Cir. 1999)(citing *Carter* and holding that the district court did not abuse its discretion in admitting the defendant's income tax information given the defendant's great unreported wealth); *see also United States v. Mobley*, 193 F.3d 492, 495-96 (7th Cir. 1999)(stating that evidence of gambling, fur coats, and other extravagant purchases was relevant to show that the defendants had a source of unlawful income); *Frost*, 914 F.2d at 769 (evidence of extravagant spending was admissible to overcome a defense of penury); *United States v. Edwards*, 885 F.2d 377, 390 (7th Cir. 1989)(stating in a forfeiture case that "where a defendant's verifiable income cannot possibly account for the level of wealth displayed and where there is strong evidence that the defendant is a drug trafficker, then there is probable cause to believe that the wealth is either a direct product of the illicit activity or that it is traceable to the activity as proceeds"). As a further example, business success has been held admissible to rebut a defense that a defendant is irrational in making business decisions. *United States v. Kessi*, 868 F.2d 1097, 1106-07 (9th Cir. 1989). In *United States v. Hogan*, 886 F.2d 1497 (7th Cir. 1989), a judicial bribery case, the court held that "evidence of wealth may be admissible to establish that a person engaged in a cash-intensive criminal enterprise, even if there is another explanation for the extra money." *Id.* at 1507. In tax evasion cases, the government is often permitted to introduce evidence of purchases, expenditures, and cash on hand under a "net worth theory" in order to prove that the defendant received unreported income. *United States v. Wirsing*, 719 F.2d 859, 861 n.4 (6th Cir. 1983).[1]

---

[1] The Supreme Court, in discussing the net worth theory in an income tax case, warned about pitfalls in the theory and told appellate courts to bear "constantly in mind the difficulties that arise when circumstantial evidence as to guilt is the chief weapon of a method that is only an approximation." *Holland v. United States*, 348 U.S. 121, 129, 75 S. Ct. 127, 132 (1954). In the instant case, however, there was plenty of direct evidence to sustain the charges against Jackson-Randolph.

The court in *United States v. Derman*, 211 F.3d 175 (1st Cir. 2000), succinctly stated the issue presented in the instant case:

> [T]he line between statements that are "appeals to class prejudice [that] are highly improper and cannot be condoned" and statements regarding class that are "relevant to the issues at hand" is not easily drawn. It is especially difficult to draw when an accused's motivation is at issue, and when, as here, the alleged motivation is financial.

*Id.* at 179 (citation omitted). Financial gain is the motive for committing almost all financial crimes, drug dealing, robberies, etc. The problem with a general rule of permitting evidence of an affluent lifestyle to show "motive" for committing a crime is that it ignores the real possibility that the extreme or extravagant wealth or spending was made possible by legitimate means and, if so, the introduction of such evidence would appeal solely to class prejudice. Therefore, the real issue is whether the relevance of motive is outweighed by unfair prejudice as contemplated by Fed. R. Evid. 403 and the due process clause of the Fifth Amendment. As stated in *Socony-Vacuum Oil Co.*, "each case necessarily turns on its own facts." 310 U.S. at 240, 60 S. Ct. at 852.

In this case, we believe the district court should have balanced on the record the relevance of motive against the prejudice of such evidence. In view of the district court's failure to balance the evidence under Rule 403, this court can balance the evidence. *See United States v. Sanders*, 95 F.3d 449, 453 (6th Cir. 1996)(balancing probative value against unfair prejudice in the absence of district court comment in ruling on admissibility); *United States v. Sriyuth*, 98 F.3d 739, 745 n.9 (3d Cir. 1996)(stating that where the district court fails to explain its grounds for denying a Rule 403 objection, the court of appeals may conduct the necessary weighing itself). In making this balance, we are guided by the Seventh Circuit's decision in *United States v. Penny*, 60 F.3d 1257 (7th Cir. 1995), a narcotics case, which set forth certain markers

Jackson-Randolph attempts to rebut this evidence by asserting that the centers were usually over their stated capacity and were serving more children more meals than permitted under the MDOE. The record reflects, however, that most of the evidence submitted on overcapacity dealt with the early days of the program before the indictment period or were isolated, minor incidents. One witness's testimony cited by Jackson-Randolph dealt with overcapacity problems back to 1981. Another witness testified to one incident of overcapacity due to a different center's furnace problem. According to another witness, there was one incident of overcapacity between 1988 and 1993, with one to four children too many for approximately 15 minutes. Finally, a fourth witness explained that MAJCO would open new centers due to overcapacity at already existing centers and that this took place before the indictment period.

Jackson-Randolph's concern regarding LaFleur's summary testimony and extrapolation techniques is further allayed by the caveat given by LaFleur and the cautionary instruction from the court. LaFleur stated that he did not judge the reliability of the testimony of the witnesses and was not commenting on the accuracy of the information. He was summarizing and calculating data based on witness testimony. The court issued a cautionary instruction to the jury before LaFleur's testimony, stating:

> This testimony and the exhibits that the government has marked are no better than the testimony or the documents on which they are based and they are not themselves independent evidence. Therefore, you are to give them [sic] no greater consideration to the summary testimony or the summaries than you would have given to the evidence upon which these summaries are based.
>
> It's for you, members of the jury, to decide whether or not the charts, the summaries, or the summary schedules correctly present the information contained in the testimony and in the exhibits on which they are based.

example, if a witness testified that they served between 40-50 children at breakfast, LaFleur would use the higher number, 50, in his calculation. LaFleur further assumed that each center was open every day of the year, including weekends and holidays, even though this was not always the case. He also assumed that three meals and a snack were served to each child per day, regardless of whether the child was a drop-in, a latchkey child, or a full-time attendee. Using these totals, LaFleur then calculated what MAJCO should have received from CCFP and then compared it to what it actually received. LaFleur concluded that MAJCO received between $13.5 and $15.5 million more than what it was entitled to during the indictment period.

LaFleur also examined roll books from 8 of the 16 centers to check the actual number of children in attendance. Again, the benefit of the doubt was given to Jackson-Randolph: LaFleur assumed that every child ate four meals, regardless of the time of day they attended; he assumed every child attended every day of the month even if the roll book listed the child for only one day; and he used the highest meal rate, the dinner price, in figuring the amount that should have been claimed. LaFleur did not compute a total amount, as he had done using witness testimony, but the calculations based on the teacher roll books confirmed that MAJCO received substantially more reimbursement than it was due.

Finally, LaFleur used immunization records from the nurse to calculate the total number of children actually in attendance. The nurse indicated that no child attended the centers who was not immunized and that the records would accurately reflect those children who were at the centers. LaFleur assumed that every child listed in the records attended every day of the month and that they all ate four meals per day, and he used the highest reimbursement rate for all the meals. Again, in a comparison with the amounts claimed, MAJCO received substantially more reimbursement than this maximum possible amount.

to help find the line described in *Derman*. *Penny* acknowledged that evidence of unexplained wealth is probative and admissible if it creates an inference of a defendant's involvement in drug trafficking. *Id.* at 1263 (citing *Hogan*, 886 F.2d at 1507, and *Edwards*, 885 F.2d at 390). The prosecution may present such wealth evidence, however, only "as long as other evidence, mainly that the wealth was not derived from legitimate sources, is presented to support the charge." *Id.* In addition, to be relevant and admissible, the lifestyle evidence "must relate to wealth acquired during the period in which narcotics trafficking occurred." *Id.* (citations omitted).

We think that these are good markers, modified to apply in the instant case. That is, the unfair prejudice does not outweigh the probative value if three factors are met: (1) there is other credible evidence, direct or circumstantial, of the illegal activity; (2) the money spent was not available to the defendant from a legitimate source; and (3) the accumulation of great wealth or extravagant spending relates to the period of the alleged illegal activity. Then the evidence would have been properly admitted to demonstrate, not just motive, but also a likelihood that the extra wealth came from illegitimate sources and to support an inference that the defendant committed the alleged crime.

Applying the factors set out above, we find that the evidence of Jackson-Randolph's lifestyle was admissible. One, there was strong evidence in the form of employee testimony, center attendance records, administrative records, bank statements, and the testimony of Allen Cohen, the meat vendor involved in her money laundering scheme, that Jackson-Randolph committed the alleged crimes. Two, the government adequately demonstrated that the money was not available during the conspiracy period from another source. The government estimated, using credit card statements and checking account activity, that Jackson-Randolph's expenditures on jewelry, clothes, and hotels and casinos amounted to approximately $3.9 million during the indictment period, 1988-1993. Tax returns and testimony

from Jackson-Randolph's accountant revealed that legitimate income from her work at MAJCO, her rental properties, and her investments amounted to $2.5 million during this same time, while her net worth rose from $2.4 million to $4.4 million. Three, the government's trial evidence of Jackson-Randolph's extravagant lifestyle and spending was limited to the indictment period, 1988-1993. Finally, the instant case does not present a situation of proof of other illegal activity that may improperly persuade a jury to convict based on uncharged crimes – for example, failure to file an income tax return, illegal gambling, or illegal purchases of controlled substances.

Jackson-Randolph argues that the lifestyle evidence must be directly connected to illegitimate sources. For example, in *United States v. Mitchell*, 31 F.3d 628 (8th Cir. 1994), relied upon by the district court in admitting the evidence, drug proceeds were used to purchase real estate and, thus, the lifestyle evidence was directly connected to the illegitimate sources. *Id.* at 631. Jackson-Randolph asserts that since there was no showing of a direct connection between her extravagant purchases and the proceeds from her fraud scheme, the evidence should not have been admitted.

While demonstrating a direct connection would certainly enhance the probative value of such evidence, it is not necessary. *Marshall*, 249 F.3d at 533; *United States v. Amerine*, 411 F.2d 1130, 1131-32 (6th Cir. 1969)(jury could infer a "natural connection" between stolen money and funds spent immediately after the theft). Demonstrating that the possessions and purchases were not derived from legitimate sources under a net worth theory also increases the probative value of the evidence. *See, e.g., United States v. Terzado-Madruga*, 897 F.2d 1099, 1120 (11th Cir. 1990). As the government demonstrated at trial through financial records and testimony from Jackson-Randolph's accountant, her specified lavish expenditures far exceeded her legitimate income while her net worth almost doubled, and this was enough to raise an inference of unlawful activity and made her participation in the fraud scheme more likely.

witness on conversation and prosecutor did not tell witness how to testify); *State v. Scott*, No. CA92-03-052, 1994 WL 394976 (Ohio App. 12 Dist. Aug. 1, 1994)(conferral between prosecutor and witness during recess did not violate sequestration order and was not prosecutorial misconduct). The sequestration order noted by the defense simply provided that witnesses were to be excluded from the trial so as to not hear the testimony of other witnesses. Ramsey's telephone conversation with the prosecutor did not violate that order. Moreover, even if the conversation with Ramsey was improper, there is no indication that it affected Jackson-Randolph's right to a fair trial. Ramsey was cross-examined by defense counsel concerning the conversation, and the statement complained of – that Martin was an employee just like Ramsey – had already been established. Thus, there was no prosecutorial misconduct, and Jackson-Randolph's right to a fair trial was not infringed.

## VI

Jackson-Randolph argues that the government's calculation of the total amount of program fraud impermissibly used extrapolation techniques that were factually unsupportable. She further alleges that the government's calculation failed to account for the centers being over their stated capacity, which was not reflected in any of the documents used by the summary witness. A review of the summary witness's method reveals that this testimony was properly admitted.

The prosecution's summary witness, Agent LaFleur, used three different sources in computing the actual number of meals MAJCO could have claimed during the indictment period: testimony from witnesses at the centers on the number of children served, teacher roll books, and immunization records. All three sources revealed that MAJCO drastically overstated its claims for food program reimbursement.

In computing the total number of meals served based on witness testimony, LaFleur utilized testimony concerning all of the centers. He always used the highest estimate from the employee regarding the number of children served. For

government prosecutor asked Ramsey about Martin's involvement in the falsification of documents. He then asked Ramsey, "does it hurt you to say that about Barbara Martin?", to which she responded affirmatively. Upon being asked why, Ramsey answered, "Because she was an employee just like me." When the government prosecutor asked what she meant by "employee," Jackson-Randolph's counsel interposed with an apparent objection, "Well, your Honor, that's clear supposition. That's not a factual statement."

The following day, Jackson-Randolph's counsel requested that the court strike Ramsey's statement that Martin was an employee. Jackson-Randolph's theory was that the testimony was prejudicial because her primary defense was that she was not involved in the daily operation of the food program and that Martin was primarily responsible. By naming Martin as a mere employee, upon "cue" from the prosecutor, Ramsey prejudiced Jackson-Randolph in a manner caused by the prosecutor. Jackson-Randolph's counsel could not provide any authority to the district court that contact between the witness and the prosecutor was improper. The district court refused to strike the testimony because Ramsey was fully cross-examined and there was no authority presented for prohibiting a prosecutor from speaking to a witness during an adjournment.

Allegations of prosecutorial misconduct contain questions of fact and law that we review de novo. *United States v. Francis*, 170 F.3d 546, 549 (6th Cir. 1999). We must first examine whether this incident amounts to prosecutorial misconduct, and if so, whether it was so egregious as to warrant a new trial. *Id.* Jackson-Randolph has not presented any authority, and this court is aware of none, for the proposition that a prosecutor may not speak with a witness during an adjournment from trial. On the contrary, courts addressing this same set of facts have found that such activity is not improper. *See State v. Pearson*, No. 03C01-9802-CR-00076, 1999 WL 692877 (Tenn. Crim. App. Aug. 31, 1999)(prosecutor's showing of pretrial statement to witness during recess not improper because defense cross-examined

Jackson-Randolph's concern of prejudice from the gambling evidence does not outweigh its probative value. While Jackson-Randolph is correct in noting that courts have cautioned against the introduction of gambling evidence where it is not an issue in the case, *see Jones v. Bd. of Trs. of Cmty. Coll. Dist. No. 508*, 75 F. Supp.2d 885, 888 (N.D. Ill. 1999), the gambling here was legal, and potential jury members were questioned regarding the influence gambling evidence might have on their ability to decide the case fairly. Also, the gambling was further evidence of massive spending. *See Mobley*, 193 F.3d at 496 (finding that evidence of the defendants' spending on gambling and fur coats was not unduly prejudicial where it demonstrated expenditures vastly out of proportion with income and the defendants contested such an imbalance).

Jackson-Randolph relies upon *Carter, supra*, in which this court reversed the conviction of a defendant after finding that the admission of evidence of appliance purchases, false loan applications, and tax returns was improper. *Carter*, 969 F.2d at 200. We found that the fact that the defendant had purchased $3,000 worth of appliances over a two-year period did not make his participation in a drug transaction more probable. The false loan applications indicated that the defendant might be untruthful but nothing more. Finally, we were "most troubled" by the evidence that the defendant failed to file tax returns because it was only probative of tax evasion, a crime for which the defendant was not on trial. *Id.* We concluded that the evidence "did not paint Carter as maintaining an unexplainably affluent lifestyle" and was thus irrelevant and inadmissible. *Id.* at 201.

*Carter* is not applicable here. The evidence in *Carter* was highly prejudicial, particularly the tax evasion, because it was probative of a crime for which the defendant was not charged. Moreover, purchasing $3,000 worth of appliances bore little weight in demonstrating the defendant's participation in a drug transaction. The lifestyle evidence against Jackson-Randolph, involving expenditures of almost $4.0 million, was probative of her participation in the alleged fraud and

embezzlement because it demonstrated expenditures and wealth accumulation grossly in excess of her legitimate income and assets. In addition, unlike the failure to pay taxes in *Carter*, there was little prejudice to Jackson-Randolph because the acts did not go to other crimes. Jackson-Randolph's purchases were legitimate, and her gambling was legal.

We conclude that the district court did not abuse its discretion in admitting this evidence.

### III

Jackson-Randolph contends that the district court should have admitted into evidence the decision and findings of an administrative hearing officer and the testimony of Barbara Martin given at the hearing regarding MAJCO employees estimating food program costs. The trial record does not indicate the reason for the exclusion of this evidence. Since the parties' briefs center on the hearsay rule, we will presume that to be the reason for the exclusion.[2]

### A

The MDOE hearing in July 1993 investigated the apparent gap between the food program claims submitted and actual costs and meals served. The administrative hearing officer summarized Barbara Martin's testimony on how MAJCO estimated its food program costs. Jackson-Randolph proposed to enter this report as evidence that the food program claims were not fraudulently increased but merely estimated by employees under this formula.

---

[2] The United States argues that this issue is not preserved for appeal because Jackson-Randolph failed to make an offer of proof pursuant to Rule 103(a)(2) of the Federal Rules of Evidence. We need not rule on whether the issue is preserved for appeal because we find that the district court did not err in excluding the evidence.

Cohen may have slanted his testimony to favor the government in order to curry favor and not be punished for tax evasion.

Jackson-Randolph's theory posits that Cohen would create a story admitting his involvement in a money-laundering scheme in order to avoid prosecution for failure to file income tax returns. This does not make sense. In addition, any potential bias on Cohen's part was exposed because the jury was already aware of Cohen's participation in the operation and Jackson-Randolph's counsel extensively cross-examined Cohen on these issues.

Even if we were to rule that the district court abused its discretion, Jackson-Randolph would have to show that the error was not harmless. *Delaware v. Van Arsdall*, 475 U.S. 673, 684, 106 S. Ct. 1431, 1438 (1986). This she cannot do. There was sufficient evidence from other witnesses and bank records regarding the money-laundering operation. While Cohen was a participant in the operation and his testimony tied the evidence together, there was sufficient evidence, even if his credibility had been undermined, to convict Jackson-Randolph.

### V

Jackson-Randolph argues that she should be given a new trial because the prosecutor spoke with a witness during a recess. During the trial, Barbara Martin, Jackson-Randolph's co-defendant, was injured in a car accident and could not complete her trial because of her injuries and medication. Witness Corliss Ramsey, one of Jackson-Randolph's personal assistants, was being cross-examined by defense counsel before and after the adjournment caused by the car accident. Ramsey testified, and the government conceded, that during the adjournment she had called the government prosecutor on the telephone. Ramsey had told the prosecutor that "it was scarier being up here than [she] anticipated" and that she was intimidated by Jackson-Randolph and Martin. Jackson-Randolph's counsel cross-examined Ramsey concerning the phone conversation. On redirect examination, the

The district court properly excluded the testimony.

## IV

Allen Cohen, a meat vendor from whom MAJCO purchased food for the food program, testified at trial regarding his involvement in Jackson-Randolph's money-laundering scheme. On cross-examination, Cohen was asked about his income tax returns. He testified that he reported the income from the MAJCO transactions, that he gave all necessary tax records to his accountant, and that he did file income tax returns in 1991 and 1992. The defense then sought to impeach Cohen's statements with testimony from Seymour Sandweise, Cohen's accountant. The district court refused to allow Sandweise to testify about Cohen's income tax because it violated Rule 608(b) of the Federal Rules of Evidence.[4] Jackson-Randolph argues that the exclusion of this testimony prevented her from presenting her theory that Cohen had a motive to lie because of his fear of tax liability.

If Sandweise had been called to testify about Cohen's character for truthfulness, this evidence would have been inadmissible pursuant to Rule 608(b). But Jackson-Randolph argues that, notwithstanding the Rule 608(b) prohibition, she should have been permitted to explore Cohen's potential bias. This court has stated that "[b]ias is always relevant in assessing a witness's credibility." *Schledwitz v. United States*, 169 F.3d 1003, 1015 (6th Cir. 1999). Bias is "the relationship between a party and a witness which might lead the witness to slant, unconsciously or otherwise, his testimony in favor of or against a party." *United States v. Abel*, 469 U.S. 45, 52, 105 S. Ct. 465, 469 (1984). Jackson-Randolph's theory is that

---

[4] Rule 608(b) provides:
Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' credibility, other than conviction of crime as provided in Rule 609, may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness (1) concerning the witness' character for truthfulness or untruthfulness . . .

---

Jackson-Randolph submits that this report is admissible hearsay under the exception in Rule 803(8), which excludes from the hearsay rule "[r]ecords, reports, statements . . . of public offices or agencies setting forth . . . against the Government in criminal cases, factual findings resulting from an investigation made pursuant to authority granted by law, unless the sources of information or other circumstances indicate lack of trustworthiness." Fed. R. Evid. 803(8). The Supreme Court has ruled that this exception permits the admission of both the factual findings and conclusions of public agencies or investigative offices as long as the findings are reliable. *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 170, 109 S. Ct. 439, 450 (1988). Thus, the MDOE hearing examiner's report is admissible as long as the sources of information relied upon are trustworthy.

The examiner based this portion of his report on the testimony of Barbara Martin, who was originally a co-defendant in this case until a car accident prevented her from continuing to participate in the trial. After the accident, Martin entered into a plea bargain. When the hearing was held in July 1993, Martin had not yet been charged with any criminal conduct and she had been intimately involved in the defrauding scheme at MAJCO. As the Food Program Coordinator, Martin helped prepare false claims and aided in the production of false documentation to support the claims. Jackson-Randolph, herself, identifies Martin as the "supervisor" of the fraudulent activities. Martin's testimony before the MDOE examiner was not trustworthy at this stage in the investigation because she was so involved in the illegal conduct and not yet charged.[3] She had a significant motive to lie about the falsity of food program claims. Since Martin's

---

[3] Contrary to Jackson-Randolph's argument, the Court is not relying on Martin's guilty plea to reach this result. This is not a case in which the government is attempting to use Martin's guilty plea against co-defendant Jackson-Randolph. Rather, the facts of the case reveal Martin's intimate involvement in the MAJCO food program scheme, suggesting the unreliability of testimony given before the case was even brought against her. The guilty plea is not a consideration in this regard.

testimony was unreliable, the examiner's report relying on that testimony is likewise unreliable and therefore inadmissible. The district court did not err in excluding it.

B

In addition to the report, Jackson-Randolph argues that Martin's testimony at the hearing should have been admitted. Jackson-Randolph asserts that the testimony meets the exception to the hearsay rule in Rule 804(b)(1), which states:

The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:

(1) Former Testimony. Testimony given as a witness at another hearing of the same or a different proceeding . . . if the party against whom the testimony is now offered, or, in a civil action or proceeding, a predecessor in interest, had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination.

Fed. R. Evid. 804(b)(1).

We will assume that Martin was unavailable as a witness both because of her attorney's indication that if she were called as a witness she would assert her Fifth Amendment privilege against testifying and her physician's opinion that the injuries she sustained in her car accident and the sedative effects of her medication impaired her ability to understand what was happening. *See* Fed. R. Evid. 804(a)(1), (4).

Nonetheless, the exception for former testimony may not apply because the United States was not a party to the MDOE hearing and did not have the opportunity to cross-examine Martin. Thus, only if we deem the Michigan Attorney General to be a "predecessor in interest" to the United States will the exception apply. The "predecessor in interest" clause, however, appears only to permit the introduction of evidence in a civil action or proceeding. We are aware of only one circuit that has applied the "predecessor in interest" clause to

a criminal prosecution. In *United States v. McDonald*, 837 F.2d 1287 (5th Cir. 1988), the Fifth Circuit recognized that the phrase "in a civil action" could refer to the type of proceeding in which the prior testimony was given rather than the type of proceeding in which it is offered. *Id.* at 1291. The court rejected the conclusion that the predecessor in interest clause was per se inapplicable to criminal cases. *Id.* A "similarity of motive" test, taken from the Seventh Circuit in *United States v. Feldman*, 761 F.2d 380 (7th Cir. 1985), was deemed more appropriate, regardless of whether the action was criminal or civil. *McDonald*, 837 F.2d at 1292. According to the Fifth Circuit, this better preserved the defendant's right to obtain evidence, properly balanced against the government's right to have the witness examined and the testimony developed with cross-examination. *Id.*

We reserve ruling on whether the "predecessor in interest" clause applies to testimony first given in a civil action and then presented in a criminal case. Here, even if the expansive *McDonald* reading is adopted, the evidence fails the "similarity of motive" test. Under *McDonald* and *Feldman*, several factors are used in determining whether a similarity of motive exists: "'(1) the type of proceeding in which the testimony is given, (2) trial strategy, (3) the potential penalties or financial stakes, and (4) the number of issues and parties.'" *McDonald*, 837 F.2d at 1292 (quoting *Feldman*, 761 F.2d at 385). Martin's testimony was given in an MDOE proceeding on "whether the Department acted properly when on June 1, 1993, pursuant to 7 C.F.R. § 226.10(b)(2), it discontinued MAJCO's participation in the AAP [advanced pay program]." The pertinent issues were MAJCO's program deficiencies and the validity of its reimbursement claims. Fraud and embezzlement were not issues at the hearing. No criminal violations were alleged. Thus, the department hearing and the criminal trial had significantly different issues, the State Attorney General and the United States Attorney had different motives in the proceedings, and different outcomes were at stake. Therefore, the Michigan Attorney General and the federal government did not have similar motives, even if that clause can be applied to a criminal case.