NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 18a0234n.06

No. 17-3393

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | **FILED** |
| | ) | May 07, 2018 |
| Plaintiff-Appellee, | ) | DEBORAH S. HUNT, Clerk |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR THE |
| NICOLE M. GATES, | ) | NORTHERN DISTRICT OF OHIO |
| | ) | |
| Defendant-Appellant. | ) | |
| | ) | |
| | ) | |

BEFORE:     DAUGHTREY, STRANCH, and THAPAR, Circuit Judges.

MARTHA CRAIG DAUGHTREY, Circuit Judge.   Nicole Gates appeals her criminal convictions for wire fraud and making a false statement to obtain federal employees' workers' compensation. On appeal she makes two arguments, both challenging the district court's partial exclusion of testimony from two of Gates's witnesses. Because Gates cannot show that the district court abused its discretion and that any such error was not harmless, we affirm.

Gates was a mail carrier for the U.S. Postal Service. In 2010, Gates sprained her knee on the job and started receiving workers' compensation. She received payments for that claim until March 2015, when she injured her knee again.

After Gates filed a second workers' compensation claim, the Office of the Inspector General flagged Gates as presenting a high risk for fraud. The office started what would become a long-running investigation into Gates's activities. The investigation began when the office,

under the guise of a marketing company, sent Gates a lifestyle survey. The survey asked Gates what kind of activities she enjoyed and whether she would partake in additional surveys for cash or free tickets to sporting and recreational events. Gates returned the survey, letting the "marketing company" know that she was interested in follow-up surveys and that she enjoyed, among other activities, baseball, softball, bicycling, physical fitness, walking, aerobics, skiing, and travel.

Between March and December, government agents conducted surveillance on Gates when she was outside of work. The agents videotaped her taking out the garbage, going to lunch with a friend, going to the doctor's office, unloading the family car, and other assorted everyday activities. As part of that surveillance, the government used Gates's survey responses to lure her into situations that would allow evaluation of her physical capabilities. When Gates arrived at the various locations, a team of government agents would follow her and videotape her activities.

For the first surveillance set up, the government gave Gates and her family tickets to a Cleveland Indians game in June and videotaped Gates going up and down stairs and walking with ease. A few weeks later, they gave her family a two-day trip to Cedar Point, an amusement park. Over the course of her time there, she walked hundreds of stairs and over 20 miles. At one point, they videotaped Gates briefly jogging through the amusement park. Finally, in October— when Gates was receiving full-time workers' compensation—the government set up and videotaped a ranger-led hike at Brandywine Falls National Park. The hike lasted more than an hour and involved stairs and uneven terrain.

During the first two government-organized outings, Gates was still working a limited schedule, and so she was not on full-time workers' compensation. For example, during part of July, Gates worked six-hour days—including on the day after the trip to Cedar Point. But on

July 24, Gates contacted her doctor and told him that her pain was an eight out of ten and that her knee was significantly swollen. After that day, through the end of the year, Gates was purportedly completely unable to work and received eight hours of daily workers'-compensation pay. During the time that she received workers' compensation payments, Gates was required to submit regular forms—sometimes filled out by her treating physician—certifying her medical restrictions and hours worked. At the end of those forms, Gates certified that the information she was providing was true. On December 9, 2015, Gates attended an interview with a government agent and was asked to bring a form that she had filled out called a Current Medical Assessment Evaluation. In that document, Gates stated that walking and standing bothered her and made her pain worse; that her injury prevented her from going on hikes and walks; that she had slight difficultly shopping, running errands, and standing from a sitting position; that she had significant difficulty walking outdoors on uneven terrain and climbing stairs; and that she was unable to kneel, squat, or bend using her knees. As with her other documentation, Gates certified that all of the information that she provided was true.

In the same form that she filled out in December—in which she said that she could not kneel or squat—Gates stated that she did not consider herself unable to perform any assignment for the Postal Service and that she would be willing to be trained for another career field. But she never affirmatively told the government that her condition had improved or that she wanted to return to work.

What is more, five days before she submitted the form, Gates spent an hour and a half shopping. During her shopping trip, she bent at the knees, squatted, carried her child on her left side, and propped her injured leg against the counter to rest her child on her injured knee while she paid.

A grand jury indicted Gates and returned a superseding indictment a few months later that charged her with 16 counts of wire fraud and one count of false statement and fraud to obtain federal employees' compensation. She pleaded not guilty and went to trial before a jury.

At trial, the government presented comprehensive proof of its investigation. That included videos that were taken of Gates over the course of months, security footage from the store where Gates shopped in December, the forms that Gates and her physician submitted, and the testimony of the agents who conducted the investigation. The agents' testimony tended to show, among other things, that Gates's activities were not consistent with someone who claimed an inability to work. Further, they testified that—other than in March 2015, shortly after her injury—the officers never saw Gates limp, use a cane, or wear a knee brace during their months-long surveillance.

For her part, Gates attempted to show that her out-of-work activities were perfectly consistent with the limitations caused by her injury. Specifically, Gates tried to show that the specific prohibitions against carrying a heavy mailbag on her route (which involved plenty of stairs) did not preclude her leisure activities that did not put the same strain on her knee as her work. She presented testimony of two of her medical caretakers to show that she was indeed injured and serious about her recovery.

Dr. Timothy Nice was Gates's orthopedic surgeon from early 2015 through October 2015. He testified that objective evidence corroborated Gates's claims of problems with her knee. Between 2010 and the end of 2015, for example, Gates underwent four knee surgeries. But Nice also relied on subjective impressions—that is, how Gates described the condition of her knee. Nice testified that he was the one who had imposed work restrictions on Gates throughout the time that he treated her.

Gwendolyn Kost, Gates's second witness, was her physical therapist from 2013 through the end of 2015. Gates had 12 sessions with Kost in 2015 after her second knee injury. Kost testified that Gates completed all 12 sessions and appeared to put in maximum effort in doing so. Like Gates's orthopedic surgeon, Kost relied on both objective evidence and subjective reports of Gates's progress.

The jury acquitted Gates of 14 charges but convicted her of two counts of wire fraud and one count of lying to obtain federal employees' benefits. The court sentenced her to six months' imprisonment.

Gates makes two arguments on appeal, both of which challenge the district court's exclusion of portions of testimony from Gates's witnesses. The deferential standard of review of most evidentiary issues disposes of both of Gates's challenges.

Whether a statement is hearsay is a question of law and so is reviewed *de novo*. *Back v. Nestle USA, Inc.*, 694 F.3d 571, 577 (6th Cir. 2012). Otherwise, we generally review the admission of evidence only for an abuse of discretion. *United States v. Jackson-Randolph*, 282 F.3d 369, 376 (6th Cir. 2002). "If we find an abuse of discretion, we reverse the district court's judgment only if the error was not harmless." *Id.* "[A]nd it is well settled that an error which is not of a constitutional dimension is harmless unless it is more probable than not that the error materially affected the verdict." *United States v. Davis*, 577 F.3d 660, 670 (6th Cir. 2009) (citing *United States v. Childs*, 539 F.3d 552, 559 (6th Cir. 2008)).

First, Gates sought to elicit testimony from her physical therapist, Kost, that Gates told Kost beforehand that she was planning on going to the hike at Brandywine. The government objected on hearsay grounds and Gates responded that the testimony was not being introduced

for the truth of the matter asserted. Instead, Gates argued, the statement showed Gates's state of mind and intention. The district court excluded the statement.

The district court erred in ruling that the statement was hearsay. "Hearsay is a statement, other than the one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." *Back*, 694 F.3d at 577 n.1 (quoting *United States v. Rodriguez-Lopez*, 565 F.3d 312, 314 (6th Cir. 2009)). For Gates's statement—that she was going hiking the next day—to be hearsay, it would have to be offered to prove that Gates indeed was going hiking. But that she did go hiking the next day is not disputed. Instead, Gates was trying to show that she was not lying about her health because she discussed the hike with her physical therapist.

Even if the statement was not hearsay, Gates still has to show that the exclusion of the statement was not harmless. The only argument that she makes on that front is that the statement would have shown that Gates wanted to comply with the advice of her medical professionals. That may be true, but that does not make it more probable than not that inclusion of the statement would have altered the verdict. After all, Gates was able to present other evidence that she was following the advice of her medical caretakers. And she offers nothing to rebut the government's main point—that Gates had a continuing duty to keep the government updated of the true status of her health. But instead of telling the government that she could engage in some physical activity (like a semi-strenuous hike), she collected eight hours per day of workers' compensation. Any error in the exclusion of the statement was harmless.

Next, Gates challenges the exclusion of testimony from Dr. Nice. Specifically, in preparation for the trial, Gates's counsel showed Nice the videos taken by the government. Counsel intended to ask Nice if the activities shown on the videos were consistent with the

restrictions that Nice gave to Gates. The district court concluded that Nice's testimony about the videos would not be probative.

As an initial matter, the parties argue over whether Nice's testimony was expert testimony or lay testimony. Specifically, they argue over whether Nice's review of the videos and testimony would satisfy Federal Rule of Evidence 701's requirement that his testimony be based on personal knowledge. Regardless of how that dispute would be resolved, we conclude that any error was harmless.

On this issue, too, Gates was attempting to show that she followed the advice of her medical professionals. Because Nice filled out the form that outlined the work restrictions, this proffered testimony is more probative than that of Kost. But showing that the specific activities in the videos were consistent with Nice's restrictions would have supported an argument that she had already made and introduced evidence to support—specifically, that Nice's restrictions applied only to her professional activity and not to her personal life.

And like the argument over Kost's testimony, this argument misses the central point—the charges were not that Gates didn't listen to her doctors; they were that she misrepresented her physical capabilities to the government while she collected regular pay as a result of those misrepresentations. Regardless of whether Nice had a problem with Gates going on a hike or to a baseball game, the government provided sufficient evidence that Gates did not meet her continuing duty to inform the government that she was physically capable of at least some employment. In light of those considerations, Gates cannot show that the exclusion of Nice's statements materially affected the verdict.

Because Gates cannot show that the district court committed an error that materially affected the verdict, we **AFFIRM** Gates's conviction.