NOT RECOMMENDED FOR PUBLICATION
File Name: 23a0012n.06

Case No. 22-5202

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | **FILED**<br>Jan 06, 2023<br>DEBORAH S. HUNT, Clerk |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF KENTUCKY |
| | ) | |
| EUGENE SISCO, III, | ) | |
| Defendant-Appellant. | ) | |
| | ) | OPINION |

Before: READLER, MURPHY, and MATHIS, Circuit Judges.

**CHAD A. READLER, Circuit Judge.** While operating several outpatient opioid abuse disorder clinics in southeastern Kentucky, Eugene Sisco, III devised two schemes aimed at bilking his clients and the federal government respectively. One involved charging his patients directly for services that Medicaid otherwise would have covered (and sometimes did actually cover). The other required patients, irrespective of medical need, to provide weekly urine samples and have those samples undergo multiple, unnecessary tests at Sisco's urinalysis laboratory. Those services were billed to the government.

Together, these schemes netted Sisco millions. They also garnered him a criminal indictment: a federal grand jury charged Sisco with one count of wire fraud (for the cash payment scheme) and one count of health care fraud (for the urinalysis scheme). After a six-day trial, a jury found Sisco guilty on both counts. We affirm.

**I.**

Eugene Sisco, III owned medical clinics that treated individuals struggling with opioid addiction. Sisco's clinics provided a collection of services commonly referred to in the health care industry as Medication Assisted Treatment (MAT). Those services included outpatient physical examinations, counseling, urine drug testing (UDT), and prescriptions for Suboxone, a medication used to treat opioid dependence. UDT was a particularly critical service, as it would confirm that a patient was taking Suboxone and not using other drugs.

Following the passage of the Affordable Care Act, Kentucky expanded its Medicaid coverage to include MAT. When it did, Sisco enrolled his businesses as Medicaid providers. That same year, Kentucky's Department of Medicaid Services advised Sisco that its Medicaid rules had been amended to prohibit providers from charging a Medicaid-eligible recipient for services covered by Medicaid; if Medicaid covered a service, such as MAT, the provider could only charge Medicaid for those services.

That warning went unheeded. Sisco's businesses continued to charge their Medicaid-eligible patients for services. To cover his tracks, Sisco told the clinic's patients that the payments were required because Renew Behavioral Health, a purportedly "independent company" that supplied services to Sisco's clinics, was not a Medicaid provider. Renew, however, existed only on paper, seemingly created by Sisco for the sole purpose of obtaining patients' out-of-pocket payments. All services supposedly done by Renew were in fact performed by employees of Sisco's clinics. The clinics also billed Medicaid for many of those same services. In total, Sisco collected over five million dollars from his patients, many of whom were Medicaid-eligible.

Sisco's billing practices did not go unnoticed. His patients complained to Kentucky officials, who, in turn, issued warnings about Sisco's business practices. When Sisco's employees

also took notice of patient complaints, Sisco brushed them off, characterizing them as "scare tactics" and falsely asserting that he had "spoken to multiple agencies" who had "cleared" his approach. He also gave a host of conflicting explanations as to why cash payments were needed.

Apart from abusing the Medicaid reimbursement process, Sisco's clinics also engaged in questionable practices related to UDT. Historically, upon arriving at one of Sisco's clinics, every patient underwent presumptive point-of-care UDT. If the presumptive test revealed the presence of drugs other than Suboxone, the clinic sent a sample for outside testing. Following Sisco's acquisition of Toxperts, a testing laboratory, practices changed at his clinics. Samples were sent exclusively to Toxperts for further testing. And Toxperts, in turn, began to utilize more sophisticated (and expensive) testing mechanisms.

Sisco's clinics started losing patients to clinics that did not charge cash. So Sisco stopped that practice. To make up the lost profits, Sisco required weekly attendance by clinic patients, which included weekly point-of-care tests. The evidence at trial, however, indicated that there was no medical need to test weekly patients who were compliant with their treatment. Sisco also mandated confirmation testing at Toxperts, testing that should typically be done only in instances where an initial sample tested positive for a substance the patient should not be taking. The net result was that Sisco billed Medicare and Medicaid for UDT with even greater frequency. In all, Toxperts netted more than four million dollars from the government over four years, including a spike in reimbursements after Sisco stopped seeking cash from his clients. Yet no written orders from a doctor existed for any of the UDT done at Sisco's clinics.

Eventually, the federal government became wise to Sisco's practices. A grand jury indicted Sisco on two separate counts. The first, wire fraud in violation of 18 U.S.C. § 1343, resulted from him charging patients for MAT services that were otherwise billable to Medicaid. The other,

3

health care fraud in violation of 18 U.S.C. § 1347, concerned his seeking payments for medically unnecessary UDT. During the ensuing trial, the jury heard from nearly 30 witnesses—including Sisco's former employees and business partners, various investigators, and expert witnesses—and received dozens of exhibits documenting Sisco's business practices. After a full week of trial, the jury returned guilty verdicts on both counts. The district court sentenced Sisco to 125 months' imprisonment on the wire fraud count and 120 months on the bank fraud count, to run concurrently. Without aid of the jury, the district court also ordered restitution in the amount of $5,699,795.70. Sisco's timely appeal followed.

## II.

**A.** Sisco's main argument is that there was insufficient evidence to support the jury's verdict as to each count. Overturning a jury verdict on appeal is a tall order. At this stage, we simply consider whether, after construing all of the evidence in favor of the jury verdict, the jury "behaved irrationally in concluding beyond a reasonable doubt that" Sisco committed wire and health care fraud. *See United States v. Miller*, 982 F.3d 412, 440 (6th Cir. 2020). The hurdle Sisco faces is particularly daunting due to the fact that his challenges implicate the jury's findings with respect to his criminal intent, which "should not be lightly overturned." *See United States v. Winkle*, 477 F.3d 407, 413 (6th Cir. 2007) (citations and quotations omitted). With this understanding of the task facing Sisco, we turn first to the wire fraud conviction.

**1.** To prove wire fraud, the government had to show that Sisco (1) devised or participated in a scheme to defraud; (2) used interstate wire communications to further the scheme; and (3) intended to deprive the victim of money or property. *See United States v. Mazumder*, 800 F. App'x 392, 394 (6th Cir. 2020) (citing *United States v. Daniel*, 329 F.3d 480, 485 (6th Cir. 2003)). Sisco takes issue with the third element, which requires a showing that Sisco acted

4

willfully—that is, for the "purpose of inducing" his victims to "part with [money or] property" that they would "not otherwise [part with] absent the misrepresentation." *Daniel*, 329 F.3d at 487 (quoting *United States v. DeSantis*, 134 F.3d 760, 764 (6th Cir. 1998)). Direct evidence of an intent to commit fraud is unnecessary; fraudulent intent can be "inferred from efforts to conceal the unlawful activity, from misrepresentations, from proof of knowledge, and from profits." *United States v. Davis*, 490 F.3d 541, 549 (6th Cir. 2007) (citations omitted).

The jury was presented with sufficient evidence to demonstrate Sisco's willful intent. First, consider his knowledge. There is no dispute that Sisco knew that he could not charge Medicaid-eligible patients for Medicaid-covered services. Indeed, state officials told him as much. Yet Sisco persisted in doing so, supporting an inference of willfulness. *See United States v. Skouteris*, 51 F.4th 658, 669 (6th Cir. 2022) (recognizing that proof of knowledge can give rise to a reasonable inference that defendant acted purposely); *United States v. Ellefsen*, 655 F.3d 769, 782 (8th Cir. 2011) (viewing the record as "replete with evidence" supporting the jury's finding as to intent where defendants "received multiple warnings" about the legality of their conduct). Next, consider Sisco's conduct. He gave his employees conflicting stories as to why he was charging patients, and then falsely told the employees that the government had blessed his decision. Those repeated misrepresentations further buttress the jury's conclusion. *See United States v. McLean*, 715 F.3d 129, 139 (4th Cir. 2013) (recognizing that "inconsistent explanations" for conduct can be probative of illicit fraudulent intent); *United States v. Strickland*, 509 F.2d 273, 276 (5th Cir. 1974) ("Concealment and falsification may reveal a consciousness of guilt and so help to carry the prosecutor's burden."). And then there is the money. Sisco accumulated millions of dollars over the years through this scheme, facts that likewise support an inference as to his intent. *See United*

*States v. Bryant*, 849 F. App'x 565, 570 (6th Cir. 2021) (holding that "jury could easily infer" an intent to defraud when defendant received over $800,000 in illicit reimbursements).

Any doubt as to Sisco's intent is put to rest by his use of Renew Behavioral Health. Recall that Renew was functionally a shell corporation Sisco created. It existed only on paper to provide the illusion that an independent non-Medicaid provider was administering services to clinic patients, when, in reality, Sisco's Medicaid-eligible patients were receiving care from a Medicaid provider. As the jury learned, Sisco altered Renew's status as a Medicaid provider shortly after learning about Medicaid's rules against cash payments. All things considered, Sisco's use of Renew further confirms his intent to fraudulently obtain payments from clinic clients. *See United States v. Maddux*, 917 F.3d 437, 446 (6th Cir. 2019) (recognizing that efforts to conceal unlawful activity can be a basis to infer a fraudulent intent).

Against this mountain of evidence, Sisco argues that the government did not show that he intended to "injure" clinic patients as those patients received "beneficial counseling services" in return for their cash. But this argument misses the point. The wire fraud statute requires an intent to defraud the victim out of "money or property." *See* 18 U.S.C. § 1343; *see also Daniel*, 329 F.3d at 485. Even if Sisco's scheme resulted in Medicaid-eligible patients receiving medical services, there is no dispute that those patients should never have paid for those services directly, as they did due to Sisco's fraud. And to the extent Sisco suggests that an "intent to injure" is distinct from an intent to deprive a victim of money or property, our case law has rejected that argument. *See Daniel*, 329 F.3d at 488 ("[T]he intent . . . to injure or harm . . . is no more than to say that the intent must be to deprive the victim of money or property.").

**2.** Turning to Sisco's health care fraud conviction under 18 U.S.C. § 1347, the government needed to show that Sisco, by obtaining payment from Medicare or Medicaid for UDT, (1) created

a "scheme or artifice" to defraud a health care program; (2) implemented that plan; and (3) acted with "intent to defraud." *United States v. Bertram*, 900 F.3d 743, 748 (6th Cir. 2018). In practice, health care fraud convictions often boil down to whether a defendant knowingly misrepresented or concealed material facts when requesting payment from a health care program. *See id.* (observing how this Court's "three-part test" interpreting 18 U.S.C. § 1347 "distract[s] more" than it "inform[s]" in a case about fraudulent urinalysis claims). At bottom, if Sisco knowingly "performed medically unnecessary tests" and billed Medicare or Medicaid for them, omitting information that revealed the impropriety of those tests necessarily constitutes a violation of § 1347. *See id.* at 749.

Ample evidence showed as much. The jury heard that Sisco's decision to switch to weekly testing for every clinic patient resulted in unnecessary point-of-care tests, particularly for patients with a history of compliance. It heard that Sisco sent all urine samples that already underwent a point-of-care test to Toxperts for a redundant, expensive screening test. And it heard that Sisco required all initial screening tests to undergo an otherwise rarely needed confirmation test. And all of this took place without any physician orders for UDT from Sisco's clinics. Sisco's awareness of the scheme is evident from his decision to increase the frequency of UDT after his wire fraud scheme fell through, changes that a Sisco clinic doctor testified were all done for "billing" purposes.

In response, Sisco characterizes his actions as simply a good faith imposition of a "standing order" for "frequent UDT for patients," with the necessity of those tests implicitly "ratified" or adopted by clinic physicians. But that portrayal is difficult to accept. Start with the fact that the evidence of ratification is scant. True, a handful of clinic doctors testified that *some* UDT is needed as part of MAT. Yet the government did not suggest that Sisco violated § 1347 simply by billing

7

for UDT; the crux of the case against him is that the volume and frequency of UDT he charged—all without any doctor's approval—was medically unnecessary. And considering that most doctors were unaware of the scope of Sisco's UDT scheme, it impossible for them to have ratified that policy. *Cf.* Restatement (Second) of Agency § 91 (Am. L. Inst. 1958) (requiring a principal's knowledge of the material facts of a transaction for ratification).

At bottom, Sisco presents an alternate view of the evidence—namely, that he was acting in good faith by imposing an order for universal testing at his clinics. But the jury heard plenty of evidence to the contrary, including from the government's expert. For instance, the jury was presented with evidence suggesting that Sisco's testing policy was motivated by financial gain, not medical need, particularly in light of the collapse of his wire fraud scheme. Given the deferential lens through which we view the record, we see no basis to upset the jury's assessment that the government carried its burden at trial. *See Miller*, 982 F.3d at 440.

**B.** Sisco also argues that the district court admitted evidence whose probative value was substantially outweighed by the risk of unfair prejudice, in violation of Federal Rule of Evidence 403. That evidence includes (1) the amount of loss at issue; (2) Sisco's purchase of a swimming pool; and (3) Sisco presenting a briefcase full of cash to his sister. Ordinarily, we review a district court's Rule 403 balancing under the deferential abuse of discretion standard. *See United States v. Chambers*, 441 F.3d 438, 456 (6th Cir. 2006) (citation omitted). But as Sisco never made this argument to the district court, we review only for plain error. *See United States v. Chalhoub*, 946 F.3d 897, 902 (6th Cir. 2020). So to prevail, Sisco must show an obvious or clear error that affected his substantial rights and seriously affected the fairness, integrity, or public reputation of the proceedings. *See United States v. Mayberry*, 540 F.3d 506, 512 (6th Cir. 2008); *see also United States v. Harmon*, 593 F. App'x 455, 461 (6th Cir. 2014) (requiring an error "so rank" that it should

have been readily "apparent to the trial judge without objection" to demonstrate plain error) (citing *United States v. Evans*, 883 F.2d 496, 499 (6th Cir. 1989)).

This is not such a case. To exclude relevant evidence under Rule 403, the unfair prejudice must substantially outweigh the evidence's probative value. *See Chalhoub*, 946 F.3d at 902, 910. Sisco fails to clear that high bar. Mentioning the nature of the losses involved in Sisco's scheme or his use of the proceeds seemingly was fair game. *See United States v. Adkins*, 744 F. App'x 292, 297 (6th Cir. 2018) (rejecting a Rule 403 challenge to evidence of loss amounts). The evidence had value—it helped illustrate the nature of Sisco's scheme and his intent to amass millions from either his patients or the government. And any suggestion of unfair prejudice seems speculative at best, especially when much of the challenged evidence was referenced only in passing at trial. Given the latitude we grant district courts in Rule 403 determinations as well as the operative standard of review, we discern no plain error.

**C.** Sisco next faults the jury instructions for failing to explain the distinction between blanket orders and standing orders for UDT. But any error in those instructions falls at least in part at Sisco's feet. At the charging conference, Sisco's attorney explained that he was "struggling with how to word" an instruction about the distinction between illicit blanket orders and permissible standing orders. Yet after verbally articulating a proposed instruction and committing to submit a written proposal to the district court, Sisco's attorney soon backtracked and approved the proposed instructions with only cosmetic edits. By his counsel doing so, Sisco waived any right to object on appeal. *See United States v. Montgomery*, 998 F.3d 693, 697 (6th Cir. 2021) (defining waiver as when a defendant "knows of" a right and "actively abandons" it).

In many respects, this case is a replay of *United States v. Budd*. There, we held that the defendant could not "complain about the court's" proposed instructions and therefore waived any

right to challenge those instructions when his counsel, after initially raising concerns about the instructions, subsequently stated that he was "comfortable" with them. 496 F.3d 517, 529 (6th Cir. 2007); *see also United States v. Daneshvar*, 925 F.3d 766, 787–88 (6th Cir. 2019) (holding that the defendant waived any argument that the court should have given a supplemental instruction when his counsel stated he was "fine" with the instructions as is and even asked the judge to "reread" the approved instructions). As in *Budd,* Sisco affirmatively approved of an instruction to which he had previously objected, a clear "intentional relinquishment . . . of a known right." *United States v. Olano*, 507 U.S. 725, 733 (1993). Accordingly, the argument is abandoned.

**D.** Finally, Sisco argues that his Sixth Amendment rights were violated because the district court—not the jury—made findings regarding the monetary loss amounts that drove the court's sentencing, restitution, and forfeiture orders. Sisco failed to preserve this argument in the district court, necessitating plain error review. But no error occurred, plain or otherwise. As Sisco acknowledges, we have held that judicial fact-finding for sentencing purposes, including for restitution and forfeiture orders, does not violate the Sixth Amendment so long as the sentencing court is not enhancing a sentence beyond the statutory maximum. *See, e.g.*, *United States v. Sawyer*, 825 F.3d 287, 297 (6th Cir. 2016); *United States v. Churn*, 800 F.3d 768, 780–83 (6th Cir. 2015). As a panel, we lack the power to revisit this court's governing precedents, contrary to Sisco's wishes. *See United States v. McKinnie*, 24 F.4th 583, 589 (6th Cir. 2022).

**III.**

We affirm the judgment of the district court.